BLANCHARD VALLEY FARMERS COOPERATIVE, INC., Appellee,

v.

ROSSMAN, Appellant.

[Cite as *Blanchard Valley Farmers Cooperative, Inc.*
*v. Rossman* (2001), 145 Ohio App.3d 132.]

Court of Appeals of Ohio,
Third District, Hancock County.

No. 5-01-04.

Decided Aug. 14, 2001.

*Benjamin F. Yale* and *Kristine H. Reed,* for appellant.

*Robert B. Hollister,* for appellee.

HADLEY, Judge.

Defendant-appellant DeWayne Rossman ("Rossman") appeals the January 10, 2001 order of the Common Pleas Court of Hancock County granting summary judgment to plaintiff-appellant, Blanchard Valley Farmers Cooperative, Inc. ("BVFC").

This case arises out of a contract dispute between BVFC, an Ohio corporation that operates a grain elevator in Findlay, Ohio, and Rossman, who conducts a farming operation, also in Findlay. Between December 19, 1994 and October 25, 1995, the parties entered into eight original contracts for the sale and delivery of wheat and corn. The basic terms of the contracts, referred to as "hedge to arrive" ("HTA") contracts, included the quantity of grain to be sold, the grade of grain, the time of delivery, and a basis as set by reference to the Chicago Board of Trade. The contracts provided that Rossman could elect to defer the delivery date and sell his grain for a higher price on the cash market. In consideration for such a deferral, Rossman would pay a fee to BVFC. All eight of the

contracts provided that they were subject to the trade rules of the National Grain and Wheat Association.

BVFC maintained a futures position on the Chicago Board of Trade that corresponded to its cash position with Rossman. When Rossman failed to perform as agreed or to offer adequate assurances of performance, BVFC cancelled the contracts and liquidated the cash positions held by the Chicago Board of Trade on those contracts. BVFC then filed suit seeking damages and declaratory relief, and Rossman filed a counterclaim.

Both parties submitted motions for summary judgment. BVFC moved for summary judgment on its declaratory claim for arbitration. Rossman moved for summary judgment on the issues that (1) the grain contracts are unenforceable as they violate the Commodities and Exchange Act ("CEA"), and (2) BVFC is not entitled to arbitration because (i) Rossman did not agree to arbitration, and (ii) BVFC waived its right to arbitration. The trial court held that the contracts are subject to arbitration in accordance with the rules and procedures established by the National Grain and Feed Association. The court below also held that the HTA contracts in question were valid cash forward contracts for shipment or delivery.

It is from this judgment that Rossman timely appeals and asserts three assignments of error.

## ASSIGNMENT OF ERROR I

"The trial court erred when it did not find off-exchange contracts resulting from trading in agricultural commodity options illegal under the CEA and the Regulations of the CFTC."

 When reviewing a summary judgment motion, we must independently review the record to determine whether summary judgment was appropriate.[1] Therefore, we will review the trial court's granting of summary judgment *de novo*.[2] Summary judgment is appropriate when (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made.[3]

---

1. *Morehead v. Conley* (1991), 75 Ohio App.3d 409, 411–412, 599 N.E.2d 786, 788. See, also, Civ.R. 56(C).

2. *Farmers Comm. Co. v. Burks* (1998), 130 Ohio App.3d 158, 163, 719 N.E.2d 980, 984.

3. *State ex. rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189, 1192–1193.

In his first assignment of error, Rossman asserts that the contracts were illegal off-exchange options contracts. Rossman claims that the trial court erred by failing to conclude that the HTAs at issue are off-exchange "commodity options," which, at the time the contracts were formed, were specifically forbidden under Section 6c(b), Title 7, U.S.Code,[4] and Section 32.2, Title 17, C.F.R.[5] The appellant's main contention is that the contracts are invalid because they contain "puts" and "calls," which are illegal options contracts within the CEA.

"A defense alleging illegality of contract is an affirmative defense."[6] When asserting that a contract is unenforceable due to an illegality, one does not dispute the terms of the agreement.[7] Asserting the defense "does not contest the existence of an offer, acceptance, consideration, and/or a material breach of the terms of the contract."[8] In the present case, no genuine issue of material fact exists as to whether Rossman breached the contracts as written.[9] The issue is whether there is any evidence in the record, when viewed most strongly in favor of BVFC, that indicates that a triable issue exists as to whether the contracts entered into by Rossman and BVFC were illegal and unenforceable under Ohio law.[10]

Rossman and BVFC agree that the grain contracts they have entered into are termed HTA contracts. In a basic HTA contract, a farmer promises to deliver grain at a specific date and a purchaser promises to pay an agreed-upon futures price set by the Chicago Board of Trade ("CBOT"), plus or minus a basis, which accounts for price fluctuations.[11] The market price at the time of delivery may be

---

**4.** Section 6c(b) provides that "[n]o person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this act which is of the character of, or is commonly known to the trade as, an 'option,' * * * contrary to any rule, regulation, or order of the Commission prohibiting any such transaction * * *."

**5.** Former Section 32.2 provided: "No person may offer to enter into, enter into, confirm the execution of, or maintain a position in, any transaction in interstate commerce involving wheat, * * * corn, [or] soybeans, * * * if the transaction is or is held out to be of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guarantee', or 'decline guarantee'."

**6.** *Countrymark Coop., Inc. v. Smith* (1997), 124 Ohio App.3d 159, 164, 705 N.E.2d 738, 741, citing *McCabe/Marra Co. v. Dover* (1995), 100 Ohio App.3d 139, 652 N.E.2d 236.

**7.** *Id.*

**8.** *McCabe/Marra Co., supra,* at 148, 652 N.E.2d at 241–242.

**9.** R.C. 1302.85 and 1302.67.

**10.** *Countrymark,* 124 Ohio App.3d at 164, 705 N.E.2d at 741.

**11.** *Eby v. Producers Coop.* (W.D.Mich.1997), 959 F.Supp. 428, 430, fn. 1.

less than the agreed price, so purchasers hedge their position on the contracts with suppliers by assuming a short position on the CBOT.[12] "A short position is an equal and opposite position to that taken in the original grain contract."[13] The purchaser takes a short position by purchasing a "put" on the CBOT, "[a]n option permitting its holder to sell a certain stock or commodity at a fixed price for a stated quantity and within a stated period."[14] A put, once purchased, hedges a grain purchaser against a market downturn occurring at the time of delivery.[15]

HTA contracts can benefit farmers by allowing them to secure a favorable price of grain before harvest, avoiding the typical market downturn at harvest time.[16] There is a risk, however, and the risk is that grain prices could rise, as happened in the fall of 1995, and a farmer could be forced to comply with the agreed price, which rests below current market value.[17]

There is a variation to the basic HTA, called the flex-HTA, which provides more flexibility to the farmer, with more risk.[18] A flex-HTA, like the HTAs in the present case, "permit farmers to roll, or extend, their delivery obligation to a future date, potentially indefinitely at their sole discretion."[19] Therefore, when the market value rises, the farmer may extend the delivery period and sell the current harvest at a more favorable price. The farmer waits for the market to return to a more favorable position before fulfilling the original obligation. When the farmer extends the delivery, the purchaser rehedges on the CBOT and passes the cost to the farmer in the form of a fee.

"Flex–HTA contracts that permit the seller to indefinitely extend the date of delivery may lend themselves to speculation and force the seller to settle up with the buyer without ever actually delivering grain."[20] The concern is that farmers and grain elevators are engaging in speculative off-exchange margin transactions without oversight by a board of exchange, rather than actually contracting for the

---

12. *Id.*

13. *Countrymark,* 124 Ohio App.3d at 165, 705 N.E.2d at 742.

14. Black's Law Dictionary (6 Ed.1990).

15. *Countrymark,* 124 Ohio App.3d at 165, 705 N.E.2d 738.

16. *Eby,* 959 F.Supp. at 428.

17. *Id.*

18. *Id.*

19. *Id.*

20. *Countrymark,* 124 Ohio App.3d at 165, 705 N.E.2d at 742.

sale and delivery of grain. Accordingly, the CEA is implicated when a contract is entered into without the intent to actually deliver, but instead with the promise to pay the difference on the margin.[21]

In the present case, Rossman and BVFC entered into flex-HTAs similar to those described above. Presumably, Rossman found a better price for his grain than he had contracted for with BVFC. Rossman has rolled delivery on the contracts and, at this late date, has yet to fulfill his delivery option in response to which BVFC has filed suit. Rossman contends that the agreements are illegal options contracts that violate the CEA and are, therefore, unenforceable. To support his argument, Rossman cites *CoBank v. Alexander*,[22] in which the court held that certain HTA contracts constituted forbidden off-exchange options under Section 6c(b), Title 7, U.S.Code. That statute requires that sales of commodities options comply with regulations promulgated by the Commodities Futures Trading Commission. The regulations in effect at the time of the agreements in the present case prohibited the sales of off-exchange grain options entirely. Rossman contends that some of the HTAs at issue in this case are similar to HTA contracts that the *CoBank* court held were options forbidden under the statute and regulation.[23]

Our review of the contract documents specifically identifies some of the underlying transactions as "calls" or "puts." As we noted in *Blanchard Valley Farmers Coop., Inc. v. Carl Niese & Sons Farms, Inc.*,[24] "rather than contemplating fixed obligations upon both parties, the transactions appear to be at least partially speculative in nature." The terms of some of the agreements appear to give option rights to BVFC, and others appear to give option rights to Rossman. Yet, other evidence in the record indicates that actual performance (delivery of grain in exchange for payment) may have been required of both parties and there appears to be a dispute as to whether any delivery of grain occurred. In conclusion, we believe that there exists a genuine dispute of material fact as to the type and legality of the transactions contemplated by the agreements.

Accordingly, Rossman's first assignment of error is sustained, and the trial court's judgment, which held that the agreements were valid cash-forward contracts, is reversed.

---

21. *Eby*, 959 F.Supp. at 428.

22. (July 27, 1999), N.D. Ohio No. 3:96CV7687, unreported.

23. See *CoBank, supra*, at 18–19.

24. (2001), 143 Ohio App.3d 795, 758 N.E.2d 1238.

## ASSIGNMENT OF ERROR II

"The trial court erred when it held that grain contracts involving off-exchange trading in grain futures were valid and enforceable contracts."

██ In his second assignment of error, Rossman asserts that the trial court erred by failing to conclude that the contracts at issue are "commodity futures," which are required to be traded on a listed exchange under Section 6a(1).[25] Rossman contends that the agreements are illegal off-exchange futures contracts, based upon the fact that each of the agreements created a right to extend delivery for an indefinite period, subject to the payment of a fee. However, in light of our decision in *Countrymark Cooperative, Inc. v. Smith,*[26] this argument is without merit. "The mere right to extend delivery is not what causes a contract to violate the CEA."[27]

█ In *Countrymark,* we held that "the CEA prohibits off-exchange transactions for the delivery of commodities in the future when the parties never actually intend to deliver the commodity or have no capacity to do so."[28] In deciding whether a transaction is a cash-forward contract or the more speculative futures contract, the court must consider whether "both parties to the contracts deal in and contemplate future delivery of the actual grain."[29] Here, though Rossman claims that he never contemplated the actual delivery of grain, the contracts explicitly stated: *"The seller hereby sells and agrees to deliver* and the buyer hereby purchases and agrees to receive in the amounts and on the terms." (Emphasis added.)

Section 1a(11) excludes from the definition of regulated contracts of sale of a commodity for future delivery "any sale of any cash commodity for deferred shipment or delivery." Recent federal district court cases have addressed CEA restrictions on grain contracts for future delivery and have held that "the forward contract exclusion, 7 U.S.C. § 1a(11), is available for cash contracts for the sale of grain that are made between persons engaged in the grain business and that are

---

**25.** Section 6(a)(1), Title 7, U.S.Code states: "[I]t shall be unlawful for any person to offer to enter into * * * any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade * * *) unless—(1) such transaction is conducted on or subject to the rules of a board of trade which has been designated by the Commission as a 'contract market' for such commodity[.]"

**26.** 124 Ohio App.3d 159, 705 N.E.2d 738.

**27.** *Id.* at 167, 705 N.E.2d at 743.

**28.** *Id.*

**29.** *CFTC v. Co Petro Marketing Group, Inc.* (C.A. 9, 1982), 680 F.2d 573, 578.

predicated on the expectation of actual, albeit deferred delivery."[30] The facts in the case at hand meet the requirements within the exclusion. BVFC operated a grain elevator capable of taking delivery of grain from Rossman, and Rossman was aware of his requirement to deliver grain to BVFC under the contracts.

Accordingly, though the terms of the agreements in *Countrymark* and *In re Grain Land Coop* differ from the contracts before this court, the rules therein control the outcome of Rossman's second assignment of error. Therefore, Rossman's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

"The trial court erred when it held that Blanchard Valley was entitled to have the dispute arbitrated and did not waive arbitration."

In his third and final assignment of error, Rossman contends that he did not consent to arbitration when he entered into the agreements. As noted earlier, each of the agreements provided that "this purchase is made subject to the trade rules of the National Grain and Feed Association." When documents are incorporated by reference into a document, they are to be read as though they are restated in the contract.[31]

The relevant provision of the trade rules in effect at the time the contracts were entered into stated that "[w]here *differences between members* of this Association cannot be amicably adjusted, said differences shall, at the request of either party, be submitted to the NGFA Arbitration committee." [32] (Emphasis added.) BVFC is a member of the National Grain and Feed Association. On the other hand, Rossman is not.

Rossman admits that his contracts with BVFC incorporated the NGFA Trade Rules and that the NGFA arbitration committee may hear disputes between members and nonmembers. However, he contends that the trade rules do not require disputes between members and nonmembers to be submitted to arbitration.

In *Niese & Sons Farms*, we determined that "Trade Rule 42(a) clearly contemplates compulsory arbitration only 'between members' of the NGFA, and there is no other mention of arbitration in any of BVFC's agreements with Niese

---

**30.** *In re Grain Land Coop Cases* (Sept. 25, 1997), D. Minn. No. 3–96–1209, at 13, reinstated on other grounds (Oct. 1, 1997), 978 F.Supp. 1267; *The Andersons, Inc. v. Crotser* (W.D.Mich. 1998), 7 F.Supp.2d 931.

**31.** *Niese & Sons Farms*, 143 Ohio App.3d at 802, 758 N.E.2d at 1244.

**32.** National Grain and Feed Association Grain Trade Rule 42(a), quoted in BVFC's Memorandum in Support of Motion for Summary Judgment.

Farms."[33] Similarly, there is no other mention of arbitration in any of BVFC's agreements with Rossman. NGFA Arbitration Rule 3(a)(2) provides an example of how non-members may consent to arbitration:

"If the contract in dispute between a member and a nonmember provides for arbitration by the National Association or under Arbitration Rules, the parties to the contract shall be deemed to have consented to arbitration under these Arbitration rules."

In the present case, the agreements made no reference to the arbitration rules: there was merely language sufficient to incorporate the NGFA Trade Rules into the agreements. No provision within the contract requires that disputes between members and nonmembers be arbitrated. Therefore, we cannot say that Rossman consented to arbitration when he entered into the agreements.

Accordingly, Rossman's third assignment of error is sustained, and the judgment of the trial court is reversed.

For the reasons stated, the judgment of the Hancock County Court of Common Pleas is affirmed in part and reversed in part. We remand this cause to the trial court for further proceedings consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

WALTERS, P.J., and SHAW, J., concur.

---

33. *Niese & Sons Farms,* 143 Ohio App.3d at 803, 758 N.E.2d at 1244.