Frank **SAGLIOCCOLO**, Plaintiff– Appellant,

v.

**EAGLE INSURANCE COMPANY,** Defendant–Appellee.

No. 96–3284.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 7, 1997.

Decided April 21, 1997.

Guy Saglioccolo (argued and briefed), Toledo, OH, for Plaintiff-Appellant.

G. Michael Curtin (argued and briefed), Keeler & Curtin, Cleveland, OH, for Defendant-Appellee.

Before: NORRIS and MOORE, Circuit Judges; RUSSELL, District Judge.[*]

MOORE, Circuit Judge.

Plaintiff–Appellant Frank Saglioccolo appeals the dismissal of his three-count complaint against Defendant–Appellee Eagle Insurance Company for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). His complaint alleged: (1) a civil claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) a claim under New York law for interference with prospective contract; and (3) a claim under New York law for intentional or negligent infliction of emotional distress. Because the district court properly dismissed the first and third claims but prematurely dismissed the second, we affirm in part and reverse in part. As a result of this conclusion, we also address whether, on remand, the district court will have subject matter jurisdiction over this remaining claim.

## I. BACKGROUND

Frank Saglioccolo owned a New York City taxicab, which was insured by Eagle Insurance Company. He also owned a New York City taxi medallion, which is a license granted by the City of New York to operate a taxi business in that city. The rights in the medallion are separate and distinct from those in the taxicab itself. Appellant operated the taxicab until July 1989, at which time he moved to Toledo, Ohio. After moving to Toledo, he remained the owner of the cab, and Eagle continued to insure it. Because appellant was no longer driving the car himself, Eagle reclassified the insurance coverage as "other than driver." Disputing this classification, appellant continued to pay the original premium amount. Eagle then canceled his policy on November 29, 1993. The pertinent allegations in appellant's complaint are as follows:

[RICO Claim]

4. Plaintiff began the process of selling his medallion in June of 1994. The medallion was listed with a N.Y. broker for sale to residents of any state. Defendant was notified of this fact.

5. Defendant was notified or · reasonably should have known that Plaintiff would incur substantial expense in the delay of Plaintiff's sale[,] due to interest pay-

---

[*] The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

ments accruing on a loan which financed the medallion.

6. A document commonly known as a "Tort Letter" is required for the completion of such a sale. The insurer in Defendant's position issues such "Tort Letters" upon request, where there are no outstanding tort claims against the insured.

7. Plaintiff requested a "Tort Letter" from Defendant on or about 6/28/94.

8. Defendant refused issuance of said "Tort Letter[,]"[ ] based on an alleged overdue insurance premium. Defendant further stated that no "Tort Letter" would issue until the alleged arrearage was paid. Defendant admitted that there were no outstanding tort claims against Plaintiff.

9. Defendant's refusal to issue the "Tort Letter"[ ] constituted extortion (18 U.S.C.1951). This extortion was intended to wrongfully place Plaintiff in fear of substantial economic harm by obstructing and delaying the sale of Plaintiff's medallion.

10. Defendant continued a pattern of such extortion activities against Plaintiff on or about 7/5/94, 7/25/94, 7/26/94 and 7/27/94. Furthermore, Defendant has committed a pattern of such extortionate activities in violation of 18 U.S.C.1962.

11. Said pattern of·racketeering activity is the actual and proximate cause of economic harm to Plaintiff in the amount of $4,693.00. In addition, Plaintiff is entitled to treble damages, court costs and reasonable attorney's fees pursuant to 18 U.S.C.1964(c).

[Interference With Contract Claim]

12. Paragraphs # 1–11 are integrated herein as though fully restated.

13. Defendant intentionally and maliciously interfered with the prospective sale of Plaintiff's medallion[ ] by the means described above.

14.· Defendant's conduct was the actual and proximate cause of economic harm to Plaintiff.

[Infliction of Emotional Distress Claim]

15. Paragraphs # 1–14 are integrated herein as though fully restated.

16. Defendant's conduct as described above was extreme and outrageous.

17. Defendant's conduct intentionally or negligently caused severe emotional distress to Plaintiff.

J.A. at 9–10 (Compl. at 2–3).

The district court granted Eagle's motion to dismiss for failure to state a claim on which relief could be granted. Dismissing the RICO claim, the court stated that because "the worst Defendant has done is to exert financial pressure on Plaintiff to recover *its own* property," Saglioccolo "has not sufficiently alleged racketeering activity under the statute." J.A. at 16 (District Ct. Op. at 4) (emphasis in original). As for the intentional interference with prospective contract claim, the court, relying on New York law, found that plaintiff failed to show that Eagle (1) acted with the sole purpose of harming Saglioccolo and (2) used wrongful means to collect its debt. J.A. at 18–19 (District Ct. Op. at 6–7). The court then dismissed the infliction of emotional distress claim because Eagle's actions did not rise to the level of "outrageous conduct" and because the retention of a debtor's property by a creditor does not constitute "reckless disregard to a substantial probability of causing severe emotional distress." J.A. at 20 (District Ct. Op. at 8). This appeal ensued.

## II. STANDARD OF REVIEW

We review de novo whether a district court properly dismissed a complaint under Federal Rule of Civil Procedure 12(b)(6). *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1041, 134 L.Ed.2d 189 (1996). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). "When an. allegation is capable of more than one inference, it must be construed in the plaintiff's favor. Hence, a judge may not grant a Rule 12(b)(6) motion based on a disbelief of a

complaint's factual allegations." *Tatum,* 58 F.3d at 1109 (internal citations omitted).

## III. THE RICO CLAIM

Appellant contends that Eagle's refusal to issue the tort letter until appellant fully paid his alleged debt amounted to a pattern of extortion and racketeering under 18 U.S.C. § 1962. That section provides in relevant part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in ... any enterprise which is engaged in ... interstate or foreign commerce....

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in ... any enterprise which is engaged in ... interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962.[1]

██ Under the plain language of § 1962, the alleged racketeering activity must constitute a "pattern." In this case, appellant contends that the pattern requirement was satisfied by the five different times Eagle allegedly refused to issue the tort letter, the first rejection occurring on or about June 28, 1994, and the last on July 27, 1994. Even if we assume that these refusals constitute separate predicate acts,[2] they fall far short of the pattern requirement.

In *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989), the Supreme Court explained that the pattern requirement is satisfied by showing (1) a relationship between the predicate acts and (2) the threat of continued activity. *Id.* at 240, 109 S.Ct. at 2901. Expanding on the continuity component, the Court stated:

"Continuity" is both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where what must be continuous, RICO's predicate acts or offenses, and the relationship these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. *Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.* Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated.

*Id.* at 241–42, 109 S.Ct. at 2901–02 (emphasis added) (internal citation omitted).

---

1. Although this case involves the collection of an alleged debt, it does not involve the "collection of an unlawful debt." Under RICO, "unlawful debt" pertains to illegal gambling debt or debt unenforceable because of usury laws. 18 U.S.C. § 1961(6).

2. In this case, the only conduct about which appellant complains is Eagle's refusal to issue the tort letter. Appellant asserts that, because Eagle refused more than once to issue the letter, more than one predicate act occurred. According-ing to appellant's reasoning, if appellant had asked Eagle dozens of times to issue the letter and Eagle had refused each time, numerous predicate acts would have occurred. At the very least, it is debatable whether a plaintiff in a RICO case can, by his own actions, transform a single predicate act into numerous different acts. We need not resolve this issue, however, because even if we assume that the five different refusals by Eagle constitute separate predicate acts, they certainly do not amount to a pattern.

In the present dispute, the alleged predicate acts at issue extended for one month, and the complaint contains no allegation that there is any future threat of this conduct by Eagle. Thus, this case easily falls within the above-cited language from *H.J.* Moreover, we have affirmed a Rule 12(b)(6) dismissal of a RICO claim containing much more continuity than appellant's claim. In *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134–35 (6th Cir.), *cert. denied*, 513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 495 (1994), we stated:

> Vemco has alleged a single fraudulent scheme by Flakt to misrepresent a guaranteed price in a building contract, and later to extort a higher price from Vemco. The total scheme, from the time of contract negotiations until the last threat alleged, lasted only seventeen months.... There is no allegation that Flakt had any association with Vemco other than the allegedly fraudulent paint finishing system contract.
>
> . . . .
>
> There are no facts pleaded suggesting anything but that once Flakt received the money it was requesting in the billing statements, its scheme would be over, and it would end its association with Vemco. Moreover, there is no allegation that Flakt engaged in similar practices on other contracts involving other parties.

In light of both *H.J.* and *Vemco*, the allegations in appellant's complaint do not satisfy the pattern requirement in § 1962. Because of this obvious defect with appellant's complaint, we need not decide, as the district court did, whether appellant failed sufficiently to allege racketeering activity, and we need not decide whether other deficiencies exist with respect to the RICO claim.

**3.** Both parties correctly agree that New York law applies. A district court sitting in diversity must apply the conflict-of-laws rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Ohio courts apply the principles in the Restatement (Second) of Conflict of Laws, directing courts to apply the law of the state with the most significant contacts to the dispute. *See Lewis v. Steinreich*, 73 Ohio St.3d 299, 652 N.E.2d 981, 984–85 (1995). In this case it is clear that the overwhelming majority of contacts are in New York.

## IV. INTERFERENCE WITH PROSPECTIVE CONTRACT CLAIM

In order to state a claim for tortious interference with prospective contract relations under New York law,[3] "a plaintiff is required to show 'the defendant's interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are 'dishonest, unfair or in any other way improper.' ' " *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 269 (2d Cir.1987) (emphasis added) (citations omitted). In this case, as the district court correctly found, appellant's complaint sufficiently alleges the knowing interference with prospective business relations. Because appellant does not allege that Eagle acted "with the sole purpose of harming the plaintiff" the issue is whether Eagle's conduct as alleged in the complaint was "dishonest, unfair or in any other way improper." [4]

■ The New York Court of Appeals has defined this "wrongful means" component as including " 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure.' " *NBT Bancorp Inc. v. Fleet/Norstar Fin.Group, Inc.*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 586, 664 N.E.2d 492, 497 (1996). Appellant's complaint clearly alleges that Eagle employed economic pressure to recover the outstanding debt. Appellant contends that this economic pressure was wrongful because an implied-in-fact agreement exists between insurance companies and their former insureds that a company will issue a tort letter upon request, assuming no tort claims exceeding the policy limit are then pending against the insured. According to this argu-

**4.** The district court seemed to require *both* the interference with contract for the sole purpose of harming plaintiff and additional wrongful means. *See* J.A. at 18–19 (District Ct. Op. at 6–7). New York law, however, provides that a showing of wrongful means, on its own, is sufficient to establish liability. *See, e.g., NBT Bancorp Inc. v. Fleet/Norstar Fin.Group, Inc.*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 586, 664 N.E.2d 492, 497 (1996); *PPX*, 818 F.2d at 269 (citing New York cases).

ment, because the disputed debt and the tort letter were unrelated, and because Eagle had an obligation to issue the tort letter, its refusal to do so was wrongful.

Two factors compel us to conclude that a Rule 12(b)(6) dismissal was inappropriate on appellant's intentional interference with prospective contract claim. First, although Eagle asserts that the Governing Committee of the New York Automobile Insurance Plan, a subdivision of the Insurance Department of the State of New York, concluded that Eagle was entitled to the disputed premium amount, the committee's decision was not attached to Eagle's motion to dismiss and is not even in the record. Thus, to affirm the district court's decision, we would have to conclude that regardless of whether the debt actually was owed, Eagle's attempt to use that debt as leverage was not wrongful—a conclusion we are unwilling and unable to reach at this pleading stage of the litigation.

Second, appellant's complaint suggests that it is industry custom for insurance companies to issue tort letters when there are no tort actions pending against their insureds. The parties have not presented us with—nor have we found—any New York law addressing an insurance company's obligation to issue tort letters. Because of this absence of legal authority, if appellant's contention is in fact true, the prevalence of an industry custom would be a relevant factor in determining whether Eagle's refusal to issue the tort letter was wrongful. *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt. i (1977) (stating that, when the courts have yet to approve or disapprove of a certain practice, "[r]ecognized standards of business ethics and business customs and practices are pertinent" in determining whether interference with a contract was improper). Although Eagle denies that it is industry custom for insurance companies to issue tort letters under the facts of this case, it has not pointed to any evidence to support its view; moreover, because this case is before us on an appeal from the district court's Rule 12(b)(6) dismissal, we could not consider such evidence even if Eagle had presented it to us. Because appellant's complaint properly alleges a claim for tortious interference with prospective con-

tract relations, we hold that the district court erred by dismissing this claim.

## V. INFLICTION OF EMOTIONAL DISTRESS CLAIM

■ Appellant alleged a claim for both negligent and intentional infliction of emotional distress. Because he has not alleged a threat of physical injury in this case, his negligent infliction of emotional distress claim fails. *See Losquadro v. Winthrop Univ. Hosp.*, 216 A.D.2d 533, 628 N.Y.S.2d 770, 771 (1995) (stating that, under New York law, a claim for negligent infliction of emotional distress must be "premised on conduct that unreasonably endangers the plaintiff's physical safety").

■ To state a claim for intentional infliction of emotional distress under New York law, a plaintiff must allege: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993). "The first element—outrageous conduct—serves the dual function of filtering out petty and trivial complaints that do not belong in court, and assuring that plaintiff's claim of severe emotional distress is genuine." *Id.* In the present dispute, the central issue regarding appellant's intentional infliction of emotional distress claim is whether the facts as alleged in his complaint amount to "outrageous conduct" under the above test as interpreted by the New York courts.

The New York Court of Appeals has taken a rather restrictive view with respect to this tort. *See, e.g., Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (1983) (" 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' ") (citation omitted); *Howell*, 596 N.Y.S.2d at 353, 612 N.E.2d at 702 ("[T]he requirements of the rule are rigorous, and difficult to satisfy. Indeed, of the

intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous.") (quotations and internal citations omitted).

The New York Court of Appeals has affirmed the dismissal of intentional infliction of emotional distress claims in cases presenting allegations much more severe than those found in appellant's complaint. In *Burlew v. American Mut. Ins. Co.*, 63 N.Y.2d 412, 482 N.Y.S.2d 720, 472 N.E.2d 682 (1984), the plaintiff, who had suffered a serious injury on the job, alleged that her employer intentionally had waited a number of months before authorizing her surgery and that this action constituted intentional infliction of emotional distress. When the defendant employer moved to dismiss the complaint, the plaintiff submitted an affidavit stating that one of the defendant's agents had yelled at her: "You're crazy if you think we're going to support you for the rest of your life." *Id.* 482 N.Y.S.2d at 722, 472 N.E.2d at 684. The court held that her complaint, even when coupled with the affidavit, does "not describe any conduct remotely approaching the standard of behavior necessary to establish such a claim." *Id.* at 723, 472 N.E.2d at 685. In *Murphy*, the plaintiff contended that he had been fired because he had disclosed to top management improprieties on the part of others and because of his age. He asserted that "defendant's top financial officer told him on various occasions that he wished he could fire plaintiff but that, because to do so would be illegal due to plaintiff's age, he would make sure by confining him to routine work that plaintiff did not advance in the company." 461 N.Y.S.2d at 233, 448 N.E.2d at 87. Affirming the dismissal of plaintiff's intentional infliction of emotional distress claim, the court concluded that "[t]he facts alleged by plaintiff regarding the manner of his termination fall far short of this strict standard [for intentional infliction of emotional distress]." *Id.* at 236, 448 N.E.2d at 90.

In this case, the facts as alleged by appellant—a creditor retaining property until an alleged debt is paid—certainly do not rise to the severity of the allegations in either *Murphy* or *Burlew*. Eagle's alleged actions cannot be regarded as "atrocious, and utterly intolerable in a civilized community." For these reasons, the district court properly dismissed appellant's intentional infliction of emotional distress claim.

## VI. SUBJECT MATTER JURISDICTION

Normally we would address issues of jurisdiction before reaching the merits of a case. In the present dispute, however, it is our resolution of the merits that creates a jurisdictional problem. In light of the fact that only the intentional interference with prospective contract claim remains, we must determine whether the district court will have subject matter jurisdiction to entertain this lone claim. Although the parties have diverse citizenship, appellant conceded at oral argument that the amount in controversy with respect to this claim was no more than $3,000. Had we not upheld the dismissal of the intentional infliction of emotional distress claim, for which appellant was seeking $2,000,000, an amount well over the amount-in-controversy requirement, original jurisdiction over both claims definitely would have existed under 28 U.S.C. § 1332.[5] *See, e.g., Klepper v. First Am. Bank*, 916 F.2d 337, 341 (6th Cir.1990) ("It is well established that claims [brought by a single plaintiff against a single defendant] can be aggregated to satisfy the jurisdictional amount requirement."); *Davis H. Elliot Co. v. Caribbean Utils. Co.*, 513 F.2d 1176, 1183 (6th Cir.1975) ("[U]nder 28 U.S.C. § 1332(a) a plaintiff can aggregate his causes of action against a defendant and it is not required that each claim against a defendant exceed [the amount-in-controversy requirement].").

To determine whether the Rule 12(b)(6) dismissal of the intentional infliction of emo-

---

5. At the time that appellant filed his complaint, § 1332(a) provided in relevant part: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between ... citizens of different States...." In 1996, Congress increased the amount in controversy requirement to amounts in excess of $75,000. *See* 28 U.S.C. § 1332(a).

tional distress claim affects the jurisdictional analysis, we turn to the traditional rule: "A court must not dismiss an action for failure to meet the amount in controversy requirement unless it appears 'to a legal certainty that the claim is really for less than the jurisdictional amount.'" *Basicomputer Corp. v. Scott,* 973 F.2d 507, 510 (6th Cir. 1992) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938)). If the pleadings themselves reveal to a legal certainty that plaintiff cannot recover enough to satisfy the amount in controversy requirement, then dismissal for lack of subject matter jurisdiction is proper. *St. Paul Mercury Indem. Co.,* 303 U.S. at 289, 58 S.Ct. at 590.

In this case, we agree with the district court that appellant's complaint failed to state a claim for intentional infliction of emotional distress. Because of this conclusion, appellant will not be able to recover any amount for this claim, much less enough to satisfy the amount-in-controversy requirement. Although we are mindful that "[o]nce jurisdiction has properly attached, it cannot be ousted by subsequent events," *Klepper,* 916 F.2d at 341, appellant's intentional infliction of emotional distress claim was defective from the start. In other words, it was clear "from the face of the pleadings, ... to a legal certainty, that the plaintiff cannot recover the amount claimed." *St. Paul Mercury Indem. Co.,* 303 U.S. at 289, 58 S.Ct. at 590. In this situation we believe that it would be improper for us to allow appellant to aggregate his remaining state-law claim with the defective ab-initio state-law claim to satisfy the amount-in-controversy requirement. *See Crouch v. Atlas Van Lines, Inc.,* 834 F.Supp. 596, 604 (N.D.N.Y.1993) (refusing to aggregate remaining state-law claims with claims that were dismissed for lack of personal jurisdiction). A contrary conclusion would give plaintiffs an incentive to insert in complaints meritless intentional infliction of emotional distress claims—claims for which the amount

in controversy often is difficult to determine—to create federal court subject matter jurisdiction over other state-law claims that, on their own, would fail to satisfy the amount-in-controversy requirement. We thus conclude that original jurisdiction over appellant's intentional interference with prospective contract claim does not exist.

This conclusion, that original jurisdiction under § 1332 is lacking, does not end our analysis, for we must consider supplemental jurisdiction as well. Because appellant's complaint also alleges a federal RICO claim, there is supplemental jurisdiction over the intentional interference with prospective contract claim, a claim forming part of the same Article III case or controversy, since it arises out of the same transaction or occurrence. *See* 28 U.S.C. § 1367(a).[6] But the presence of supplemental jurisdiction does not mean that the district court in this case must entertain this claim. Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction[.]" Indeed, "'if the federal claims are dismissed before trial, ... the state claims [generally] should be dismissed as well.'" *Taylor v. First of Am. Bank–Wayne,* 973 F.2d 1284, 1287 (6th Cir.1992) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)) (omission in *Taylor*). On remand, the district court should therefore determine whether, in its discretion, it wishes to exercise supplemental jurisdiction over the intentional interference with prospective contract claim, since that is all that remains in this case.

For the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.

---

**6.** Section 1367(a) provides in relevant part:
Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction

over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.